## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES WISHARD and JENNIFER        :        Civil No. 1:18-CV-01665
WISHARD, on behalf of their minor  :
child, J.W.,                        :
                                    :
      Plaintiffs,               :
                                    :
      v.                        :
                                    :
WAYNESBORO AREA SCHOOL              :
DISTRICT,                           :
                                    :
      Defendant.                :        Judge Jennifer P. Wilson

## <u>MEMORANDUM</u>

This is an appeal from a state administrative hearing under the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs James Wishard and Jennifer Wishard ("Plaintiffs" or "parents"), who bring suit on behalf of their minor son, J.W., allege that Defendant Waynesboro Area School District ("Defendant" or "the district") violated J.W.'s rights under IDEA when it reduced the percentage of time that he was to spend in a regular education classroom. The case is presently before the court on the parties' cross motions for summary judgment. For the reasons that follow, Defendant's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.

### STATUTORY BACKGROUND

IDEA sets federal standards for the education of children with disabilities in public schools that states must meet in order to receive certain federal funds.

1

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. __, 137 S.

Ct. 988, 993 (2017).  Three of those standards are particularly relevant for the

present litigation.  First, IDEA requires states to provide a "free appropriate public

education" ("FAPE") to all children.  20 U.S.C. § 1412(a)(1)(A).  Second, IDEA

requires school districts to develop individualized education programs ("IEP") for

all students with disabilities, and requires schools to review and revise those IEPs

as necessary.  *Id.* § 1412(a)(4).  Finally, IDEA requires schools to educate students

in the "least restrictive environment," which requires that students with disabilities

be educated with students who are not disabled "to the maximum extent

appropriate."  *Id.* § 1412(a)(5)(A).

To comply with IDEA, a state must provide special education and related

services to a child with a disability in conformity with the child's IEP.  20 U.S.C. §

1401(9); *Endrew F.*, 137 S. Ct. at 994.  An IEP "is the means by which special

education and related services are 'tailored to the unique needs' of a particular

child" and must be drafted in compliance with detailed procedures that are meant

to foster collaboration among the child's parents and educators.  *Endrew F.*, 137 S.

Ct. at 994 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester*

*Cty. v. Rowley*, 458 U.S. 176, 181 (1982)).

In order to ensure compliance with its requirements, IDEA imposes a

number of procedural safeguards that schools must provide for children with

2

disabilities.  A school seeking to initiate or change a child's identification, evaluation, or educational placement must provide written notice to the child's parents prior to taking such an action.  20 U.S.C. § 1415(b)(3).  Parents who disagree with the school's proposed action may then present a complaint to the school if they feel that the proposed action violates IDEA.  *Id.* § 1415(b)(6).

Several procedures may be invoked when a complaint is filed under IDEA. The complaining parents and the school may participate in mediation or a preliminary meeting to attempt to resolve the complaint informally.  *Id.* §§ 1415(e)(1); 1415(f)(1)(B)(i); *Endrew F.*, 137 S. Ct. at 994.  If such informal procedures do not resolve the complaint, the parties may proceed to an impartial "due process hearing" conducted either by the state or local educational agency. 20 U.S.C. § 1415(f)(1)(A); *Endrew F.*, 137 S. Ct. at 994.  The parties may then appeal the ruling made at the due process hearing to a state court or to a United States District Court.  20 U.S.C. § 1415(h)(2)(A); *Endrew F.*, 137 S. Ct. at 994.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States, and 20 U.S.C. § 1415(i)(3)(A), which gives district courts jurisdiction over appeals from due process hearings under IDEA.

STANDARD OF REVIEW

The parties' cross motions for summary judgment are properly construed as motions for judgment on the administrative record. *See, e.g.*, *Council Rock Sch. Dist. v. Bolick*, No. 09-CV-05604, 2010 WL 5186154, at *4 (E.D. Pa. Dec. 22, 2010) ("[W]hen there is no new evidence presented to the district court, as in this case, the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record" (quoting *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 n.2 (6th Cir. 1998))); *accord M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 n.15 (D.N.J. 2007) (citing *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002)).

A court reviewing a state administrative proceeding under IDEA must (1) "receive the records of the administrative proceedings"; (2) "hear additional evidence at the request of a party"; and (3) "basing its decision on the preponderance of the evidence, . . . grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

In conducting its review of whether an IEP meets IDEA's substantive standards, the court applies a "modified de novo" standard of review. *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009) (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003)). The court must give "'due weight' and deference to the findings in the administrative proceedings." *Id.* (quoting *Rowley*, 458 U.S. at 206). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *Id.* (quoting *Newark*, 336 F.3d at 270).

The question of whether an IEP is appropriate under IDEA's substantive standards "is a question of fact." *P.P.*, 585 F.3d at 735. Accordingly, an administrative factfinder's determination regarding the appropriateness of an IEP is entitled to deference. *Id.* at 734. The party challenging the administrative decision bears the burden of persuading the court that its requested relief is appropriate. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

Credibility determinations made by an administrative finder of fact are "due special weight." *Shore Regional high Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citing *Newark*, 336 F.3d at 271). "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would

*justify* a contrary conclusion.'" *Id.* (quoting *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995)).

A court reviewing an administrative proceeding under IDEA is obligated not to impose "its own view of preferable educational methods on the states." *Oberti ex rel. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1219 (3d Cir. 1993) (quoting *Rowley*, 458 U.S. at 207). IDEA does not allow courts "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F.*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S. at 206). The question a court must answer "is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999 (emphasis in original).

## FACTUAL BACKGROUND[1]

J.W. is a resident of Waynesboro Area School District who has been diagnosed with autism and speech and language impairments and has received medication for Attention Deficit Hyperactivity Disorder ("ADHD"). (Special

---

[1] The facts in this section are derived from the findings of fact in the Special Education Hearing Officer's decision and the parties' statements of material facts filed in connection with their motions for summary judgment. (*See* Docs. 18-2, 26, 27-2, 30–31.) In accordance with the applicable standard of review, the court will adhere to the hearing officer's findings of fact and treat them as correct. *See P.P.*, 585 F.3d at 734 ("Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why."). Accordingly, facts taken from the parties' statements of fact are provided only to supplement the hearing officer's factual findings.

Education Hearing Officer Decision and Order at 2–3 [hereinafter Hearing Officer Decision.])[2]  As relevant here, he was first evaluated by the district's local Intermediate Unit ("IU") when he was two years old.  (*Id.* at 2.)  The IU reported that J.W. had below average development in multiple domains, borderline estimated cognitive ability, significant delays in communication, and below average fine motor skills.  (*Id.*)  J.W. began receiving early intervention services at age 2, including speech and language therapy, occupational therapy, physical therapy, and behavior support services.  (*Id.* at 3.)

J.W. was evaluated again in preparation for his transition to kindergarten in March 2012.  (*Id.* at 2.)  At that point, J.W. displayed cognitive ability in the below average range for verbal and non-verbal reasoning with age-appropriate adaptive behavior scores, below average fine motor skills, average school-readiness skills, average letter/word identification, and average mathematics problem solving.  (*Id.* at 2–3.)

By the time he was in first grade, J.W. demonstrated significant difficulties in expressive, receptive, and pragmatic language.  (*Id.* at 3.)  He also demonstrated significant difficulties in visual-motor skills, pre-writing skills, attention, initiation of classroom tasks, completion of tasks, and social skills.  (*Id.*)

---

[2] The Special Education Hearing Officer's decision is docketed in this case at Doc. 18-2.

J.W. was re-evaluated near the end of his first-grade year in April 2014, at which point the district classified him as having autism and speech and language impairments. (*Id.*) During this re-evaluation, J.W.'s full scale IQ score on a standardized test was significantly below average and considered impaired. (*Id.*) J.W. exhibited strength in short-term memory. (*Id.*) J.W. also demonstrated impaired verbal comprehension and processing speed and significant difficulty understanding directions. (*Id.*) His adaptive skills were rated as extremely low on a standardized adaptive skills inventory, though some of his teachers noted that they considered his adaptive skills merely below average. (*Id.*) The re-evaluation noted that J.W. received support through most of the school day from a therapeutic staff support person and that J.W. relied heavily on this person for a sense of safety, cues, and prompts. (*Id.*)

During the April 2014 re-evaluation, J.W.'s composite achievement score was significantly below average. (*Id.*) His listening comprehension, oral expression, reading skills, mathematics skills, and writing skills were all below the levels expected for children of comparable age. (*Id.*) J.W.'s visual-motor integration skills varied from low to very low, with observed difficulties following the directions on a standardized test. (*Id.* at 4.) His social awareness was considered mildly to moderately impaired, with some observed difficulties in reciprocal social behavior. (*Id.*)

As part of the April 2014 re-evaluation, the district performed a sensory evaluation on J.W.  The evaluation demonstrated that J.W. had significant dysfunction in handling visual stimuli, some difficulties in handling auditory stimuli, typical sensitivity to tactile stimuli, some problems with proprioception,[3] and some problems with his vestibular system.[4]  (*Id.*)

The evaluator who completed J.W.'s April 2014 re-evaluation noted that he needed reassurance, that he could possibly be overstimulated in large-group settings, that he had difficulties in understanding multiple-step directions, and that he had difficulties with high-level thinking skills.  (*Id.*)  The evaluator recommended that J.W. receive learning support so that he could benefit from more individual interaction with a teacher, receive more immediate feedback, and reduce his anxiety while still providing opportunities for interactions with his peers.  (*Id.*)  The evaluator recommended that J.W. receive occupational therapy to address his sensory needs, visual-motor deficits, and difficulties in initiating and completing tasks.  (*Id.*)  The evaluator also recommended that J.W. receive speech

---

[3] Proprioception is the "perception of the position and movements of the body."  OXFORD ENGLISH DICTIONARY (3d ed. 2007).  All dictionary and encyclopedia definitions in this opinion are provided purely to aid the reader's understanding.

[4] The vestibular system is an "apparatus of the inner ear involved in balance."  *Vestibular System*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/science/vestibular-system (last visited Aug. 20, 2020).

and language therapy to address his deficiencies in articulation, receptive language, expressive language, and pragmatic language. (*Id.*)

In May 2014, J.W.'s parents obtained a private neuropsychological report from Dr. Lee Anne Grisolano, which diagnosed J.W. with autism, ADHD, and mixed expressive receptive language disorder. (*Id.*) The private report indicated that J.W. had mildly impaired overall cognitive function with a general IQ of 58. (*Id.*)

When J.W. was in second grade, he was assigned to a regular education classroom with special education support services for reading, writing, and mathematics, as well as speech and language therapy and occupational therapy. (*Id.* at 5.) During his second-grade year, J.W. made slow progress in reading and continued to read at a first-grade level. (*Id.*) He made significant progress in mathematics, but continued to perform at below grade level. (*Id.*) He made significant progress in his writing skills. (*Id.*) He displayed continued deficiencies in speech and language, with his language skills falling behind his age cohort in thirteen of sixteen measured language skills. (*Id.*)

During classroom observations conducted by his occupational therapist during his second-grade year, J.W. demonstrated visual-motor control and the ability to write legibly when given special paper with graphic boxes and other assistive technology. (*Id.* at 6.) J.W.'s continued difficulty with remaining on task

10

and frequent need for redirection interfered with the pace of instruction in small-group settings, but J.W.'s peers helped him attend to instruction and were eager to play with him.  (*Id.*)

In preparing J.W.'s IEP for his third-grade year, his parents expressed concerns about his executive functions; his social conversation and skills; his ability to use snaps and buttons and tie his shoes; his pragmatic, receptive, and expressive language; and his articulation.  (*Id.*)  After a meeting with his parents, J.W.'s IEP team revised his IEP for his third-grade year.  (*Id.*)  The IEP for his third-grade year kept him in the same placement as he had been in during second grade, with thirty minutes a week for reading support outside the classroom and thirty minutes for math support outside the classroom.  (*Id.*)  It also included two twenty-five-minute small-group speech and language sessions a week, thirty minutes of in-class math support, and thirty minutes of group occupational therapy. (*Id.*)  The IEP provided for several modifications that the district was to implement for J.W. in the regular education classroom, including:

> Multisensory delivery of instruction, including modeling; incorporating visual-perceptual and visual-motor activities into academic instruction; modified directions; extra time; decreasing visual distractions; movement or sensory breaks; modified assignments and homework; accommodated assessments, including separate room, reading directions and permitting re-reading of materials prior to comprehension assessments; use of tangible spacers to support writing; time set aside daily to practice fasteners; a communications book between school and home; family opportunity to preview and practice

physical education lessons; and encouragement of collaborative and group play during indoor recess.

(*Id.* at 6–7.)

On June 27, 2015, J.W.'s parents obtained a private reading evaluation for J.W. that was conducted by Dr. Stephanie K. Harty ("Dr. Harty"), a consultant reading specialist.  (*Id.* at 7; Doc. 27-1 ¶ 47; Doc. 31 ¶ 47.)  Dr. Harty's evaluation indicated that J.W. could read at a grade-appropriate level, that his comprehension was at a high level when he was given adequate time to process what he had read, and that his writing performance improved when he was given adequate time and opportunity to plan what he was going to write.  (*Id.*)  Dr. Harty recommended allowing J.W. to read and write at his own pace and recommended a number of other strategies to facilitate J.W.'s reading and writing.  (*Id.*)  J.W.'s parents and the district subsequently agreed to change J.W.'s IEP without an IEP meeting in October 2015 to address reading comprehension instead of oral reading fluency. (*Id.*; Doc. 27-1 ¶ 54; Doc. 31 ¶ 54.)

On February 12, 2016, J.W.'s parents obtained a private assistive technology assessment from Richard Lytton ("Lytton"), a speech and language pathologist. (Hearing Officer Decision at 7; Doc. 27-1 ¶ 69; Doc. 31 ¶ 69.)  Lytton found that J.W.'s ability to respond to oral directions and cues improved when he was given printed directions simultaneously with oral directions.  (Hearing Officer Decision

at 7–8.)  Lytton also noted that J.W. struggled to type on a standard QWERTY keyboard and evaluated J.W.'s ability to type using alternative software that permitted easier, quicker typing.  (*Id.* at 8.)  Lytton concluded that J.W.'s deficient spelling ability impeded his ability to use his full vocabulary while writing, and that his visual-motor weaknesses and hypotonia[5] impeded his ability to use a QWERTY keyboard.  (*Id.*)  Based on those conclusions, Lytton recommended that the school provide J.W. assistive technology that would suggest spellings and predict words.  (*Id.*)  Lytton also recommended assistive software to help J.W. learn to type and software to support his note taking.  (*Id.*)

J.W. began to exhibit severe inattention and distraction in a classroom environment and extreme unresponsiveness to classroom directions in February 2016.  (*Id.*)  J.W.'s parents met with members of J.W.'s IEP team that month, after which his parents and the district agreed to modifications to his IEP to include extra time for packing his things at the end of the day and two daily checklists for unpacking and packing his book bag.  (*Id.*)  The IEP team then revised his IEP again in March 2016 following an IEP meeting, adding strengths in mathematics and recall of information and progress in reading, writing, articulation, word

---

[5] Hypotonia is defined as "[t]he condition (in muscle or muscular tissue) of being hypotonic," which in turn is defined as "[e]xhibiting or characterized by diminished tone or tension (in muscle or muscular tissue).  OXFORD ENGLISH DICTIONARY (2nd ed. 1989).

structures, eye contact, social skills, and classroom independence.  (*Id.*)  The revised IEP also included a new modification providing for materials to be sent home to enable him to practice speech skills while at home.  (*Id.*)

The district conducted an IEP meeting on April 18, 2016.  (*Id.*)  Following that meeting, the IEP team revised J.W.'s IEP.  (*Id.*)  The revised IEP set J.W.'s reading comprehension goal as comprehension on a second-grade level because he had met his previous goal of attaining reading comprehension at a first-grade level. (*Id.*)

On April 22, 2016, J.W.'s parents obtained a private sensory processing evaluation of J.W.  (*Id.*)  The evaluation found that J.W. had some difficulties in sensory processing and recommended a sensory diet and sensory breaks at least twice a day.  (*Id.*)  Educators in the district had been providing J.W. some sensory interventions prior to this evaluation, and continued to do so as J.W. moved into fourth grade and then fifth grade.  (*Id.* at 9.)

J.W.'s grades for the third marking period during his third-grade year showed that he was performing below benchmarks in many areas.  His reading was generally below grade level and below basic in most reading skills, though he was able to read independently.  (*Id.*)  He scored 40% in reading comprehension at a second-grade level.  (*Id.*)  He made slight progress in mathematics, but continued to score below benchmark and below basic.  (*Id.*)  He was also performing below

benchmark levels in science and social studies. (*Id.*) He performed at benchmark level in the writing skills of focus, organization, and conventions, but remained below benchmark in content/details and style. (*Id.*) J.W. showed progress in speech and language skills during this period, except for social skills, in which he had regressed. (*Id.*) J.W. also showed progress in handwriting legibility. (*Id.*) The district contracted with the IU for assistive technology services for J.W. on May 2, 2016. (*Id.*)

On May 2, 2016, J.W.'s IEP team had an IEP meeting in preparation for his fourth-grade year. (*Id.* at 10.) The IEP team changed J.W.'s official placement from itinerant learning support to supplemental learning support with itinerant speech and language services because the percentage of time J.W. would spend in the regular education classroom was calculated to be 79%, which was lower than Pennsylvania's definition of itinerant learning support. (*Id.*)

J.W.'s revised IEP for fourth grade provided that he would be educated in the regular education classroom for all core academic subjects except for daily thirty-minute writing sessions in the learning support classroom and two twenty-five-minute small-group speech and language sessions per week. (*Id.*) The IEP provided that J.W. would daily receive thirty minutes of reading support in the regular education classroom and thirty minutes of math support in the regular education classroom. (*Id.*)

In terms of speech and language goals, J.W.'s fourth-grade IEP provided a slightly changed articulation goal to reflect the fact that he had made progress with the /r/ sound.  (*Id.*)  It also revised his word structures goal to reflect work on different word forms and provided a goal for answering "wh" questions.  (*Id.*)  The IEP provided a pragmatic language goal with an increased goal level.  (*Id.*)

The fourth-grade IEP provided a reading comprehension goal of reading comprehension at the second-grade level to reflect J.W.'s independence at first-grade-level reading.  (*Id.*)  J.W.'s writing and mathematics goals remained unchanged.  (*Id.*)  The IEP also provided modifications in addition to those that had already been provided in J.W.'s previous IEPs, including the use of an iPad, graphic visual supports for mathematics and writing, adapted cutting paper for visual support, and opportunities for peer support.  (*Id.*)  J.W.'s parents accepted his fourth-grade IEP.  (*Id.* at 11.)

On May 19, 2016, the IU provided the district with an assistive technology assessment for J.W., which was done at the request of his parents and performed by the IU's assistive technology consultant, Julie Cunningham-Henise ("Cunninham-Henise").  (*Id.*; Doc. 27-1 ¶ 77; Doc. 31 ¶ 77.)  The assessment was based in part on a written questionnaire that J.W.'s parents had filled out and an interview with his parents.  (Hearing Officer Decision at 11.)  The assessment also considered interviews and questionnaires with J.W.'s teachers and other service

providers.  (*Id.*)  Cunningham-Henise concluded that Lytton had used questionable methodology in assessing J.W.  (*Id.*)

In terms of substantive recommendations, the IU's assistive technology assessment recommended against providing J.W. with a text reader with fourth-grade text because it was considered unlikely to help J.W.'s reading comprehension.  (*Id.*)  It recommended trial of a text reader that emulated a teacher's explanation of the text.  (*Id.*)  It also recommended a trial of software to break down and retell/visualize/discuss text on a sentence-by-sentence basis.  (*Id.*)  It further recommended trial of software to assist in instructing J.W. directly in text vocabulary.  (*Id.*)

Moving beyond reading, the assistive technology assessment recommended trial of software to assist J.W.'s writing that would include word-prediction software and an ABC keyboard to replace the QWERTY model.  (*Id.*)  The assessment recommended trial of specialized graph paper to help J.W. with aligning digits for mathematics computation.  (*Id.*)  The assessment also recommended trial of three software programs to aid J.W.'s general studying and learning processes.  (*Id.*)  J.W.'s parents met with educators from the district to discuss assistive technology on August 31, 2016.  (*Id.*)

Following the August 31, 2016 assistive technology meeting, J.W. began his fourth-grade year using a laptop.  (Doc. 27-1 ¶ 80; Doc. 31 ¶ 80.)  One week into

the year, the laptop was replaced with an iPad.  (*Id.*)  J.W. had trouble typing on the iPad, and personnel from the district told J.W.'s parents that the district did not offer typing instruction.  (Doc. 27-1 ¶¶ 81–82; Doc. 31 ¶¶ 81–82.)  The iPad J.W. was using had the option of an ABC keyboard instead of a QWERTY keyboard, but the district never tried this option, despite Cunninham-Henise's recommendation that the district take such a step.  (Doc. 27-1 ¶ 83; Doc. 31 ¶ 83.)  Nevertheless, J.W.'s parents observed his use of the iPad at home and noted that J.W. appeared to enjoy using the iPad and appeared less resistant to writing than he had been when writing by hand.  (Doc. 27-1 ¶ 84; Doc. 31 ¶ 84.)

At the beginning of J.W.'s fourth-grade year, his benchmark achievement levels were scored as below basic.  (Doc. 26 ¶ 33; Doc. 30 ¶ 33.)  One of J.W.'s fourth-grade classrooms had a paraprofessional to assist the teacher with instruction, and the paraprofessional worked with J.W.  (Hearing Officer Decision at 11.)  J.W. was also allowed to take sensory breaks, received extended time on tests, took modified quizzes and tests, and received auditory and visual cues.  (Doc. 26 ¶ 34; Doc. 30 ¶ 34.)  J.W.'s fourth-grade teacher for science, social studies, and writing summarized materials for him, previewed science materials for him and modeled science experiments, and provided him with both written and oral instructions.  (Doc. 26 ¶ 36; Doc. 30 ¶ 36.)  She additionally modified writing assignments for J.W., sometimes requiring him to only write one paragraph where

18

his classmates would be required to write five paragraphs.  (Doc. 26 ¶ 40; Doc. 30 ¶ 40.)  Despite these modifications, the teacher testified that throughout the year she felt that J.W. "did not make progress."  (Doc. 26 ¶ 39; Doc. 30 ¶ 39.)

J.W.'s fourth-grade regular education classroom teacher also testified about his instruction during fourth grade.  The teacher had paraprofessionals in her room and a learning support teacher who would come into the classroom to provide instruction to students.  (Doc. 26 ¶ 44; Doc. 30 ¶ 44.)  The classroom teacher and the learning support teacher worked together to modify the curriculum for J.W. (*Id.*)  The classroom teacher summarized material for J.W. and sometimes rewrote material so that it would be suitable for his reading level.  (Doc. 26 ¶ 46; Doc. 30 ¶ 46.)  Despite these modifications, J.W. continued to struggle and appeared to regress based on his benchmark results.  (Doc. 26 ¶ 47; Doc. 30 ¶ 47.)  The classroom teacher testified that she felt J.W. needed more support than he could receive in a regular education classroom.  (Doc. 26 ¶ 49; Doc. 30 ¶ 49.)

In September 2016, the district obtained a review of J.W.'s classroom behaviors by a behavior specialist.  (Hearing Officer Decision at 11.)  The behavior specialist recommended that the school implement behavior interventions, including sensory interventions, modifications to J.W.'s instruction, and behavior-shaping strategies.  (*Id.* at 12.)  J.W.'s mother and Dr. Harty also observed J.W. in the classroom during this period.  (*Id.*)  His mother reported that the teachers in the

19

classroom were not implementing many of the modifications that were provided in J.W.'s IEP.  (*Id.*)  She also expressed concern that classroom events were causing J.W. to become frustrated and that the teacher did not seem to be taking sufficient action to prevent or reduce his frustration.  (*Id.*)

On September 19, 2016, J.W.'s parents obtained a private occupational therapy report.  (*Id.*)  The report recommended that J.W. receive a sensory diet, that the school allow times for J.W. to engage in sensory activities, that the school allow J.W. to stand or sit on the floor while doing classroom work, that the school allow J.W. to employ various sensory devices while sitting at his desk, that the school provide a calming area for J.W., and that the school take steps to reduce distracting noises and visual distractions.  (*Id.*)

On September 22, 2016, Cunningham-Henise reviewed J.W.'s trial with assistive technology software and recommended changing to a different software. (*Id.*)  J.W.'s parents were not notified of this recommendation, and they requested that they be included in such discussions.  (*Id.*)  The assistive technology trials did not include the use of an ABC keyboard as had been previously recommended. (*Id.*)

In October 2016, J.W.'s parents obtained a private occupational therapy evaluation.  (*Id.*)  The evaluation recommended that the district allow J.W. sensory breaks that would be facilitated by a trained professional overseen by an

occupational therapist.  (*Id.*)  The evaluation further recommended that J.W. be taught to self-regulate through explicit instruction, that the district provide a calming space, and that the district teach J.W. self-advocacy and social skills.  (*Id.*)

On October 24, 2016, Cunningham-Henise recommended that the district implement parent notification and team decision-making on assistive technology decisions.  (*Id.* at 13.)  She further recommended that the assistive technology that the district had provided to J.W. be sent home so that J.W.'s parents could work with him on the software at home.  (*Id.*)

J.W.'s parents obtained another private occupational therapy report on October 24, 2016.  (*Id.*)  The report recommended that J.W. be provided a sensory diet throughout the school day that would be provided by a paraprofessional and overseen by an occupational therapist.  (*Id.*)  It recommended teaching J.W. to recognize his own sensory needs and to devise his own sensory diet.  (*Id.*)  The report further recommended trial of various sensory regulation products, the provision of a calming space, multisensory instruction, provision of a paraprofessional, provision of a confidential signal that J.W. could give to the teacher when he needed a bathroom break, and social skills instructions to include self-advocacy.  (*Id.*)

On October 26, 2016, the district's occupational therapist and behavior specialist completed a sensory and behavior report for J.W.  (*Id.*)  The report was

based on J.W.'s previous district and private reports, interviews with his parents

and educators, classroom observations, and a review of pertinent literature.  (*Id.*)

The report classified J.W. as a student with "low registration," which reduced

J.W.'s engagement and attention in school.  (*Id.*)  The report recommended that the

district implement behavior interventions emphasizing use of clear expectations

and positive reinforcement for J.W.  (*Id.*)  The report also recommended sensory

breaks; brief sensory activities; daily exercise with a peer; structuring, modifying,

and chunking of school work; and that directions be given step by step.  (*Id.*)

On November 17, 2016, the district convened a meeting to discuss J.W.'s

program, including his use of assistive technology.  (*Id.*)  As a result of this

meeting, the iPad that J.W. had been using was returned to the IU, and J.W.

resumed using a QWERTY keyboard.  (*Id.* at 13–14.)  Although the district had

other available iPads that J.W. could use, the district concluded that the trial of the

iPad had not succeeded because of the time that it took away from his instruction.

(*Id.* at 14.)

On February 24, 2017, the district convened an IEP meeting after data

showed that J.W. had not recouped skills that he had lost over the winter break.

(*Id.*)  The district offered extended school year instruction to J.W. through a special

education summer program run by the IU.  (*Id.*)  J.W.'s parents rejected the

22

extended school year placement. (*Id.*) The district then convened another IEP meeting on March 7, 2017 to discuss J.W.'s assistive technology trials. (*Id.*)

By May of his fourth-grade year, J.W.'s growth and achievement in reading had slowed, and he was functioning below grade level and below the basic range in reading. (*Id.*) J.W.'s growth and achievement in writing had also slowed. (*Id.*) He was not showing adequate progress in mathematics, as he continued to function below grade level and below the basic range. (*Id.*) He showed progress in speech and language skills, including progress in articulation, receptive and expressive language, and pragmatic/social language. (*Id.*)

Observations of J.W. during his fourth-grade year indicated that he was more distracted during small-group sessions that occurred in the regular education classroom than he was during small-group sessions that occurred outside of the regular education classroom. (*Id.*) District employees also concluded that J.W.'s assistive technology trials had conferred minimal benefits on J.W. and that the benefits were not worth the instructional time that J.W. lost as a result of the technology. (*Id.* at 15.)

J.W. continued to exhibit significant inattention and lack of focus in the classroom during his fourth- and fifth-grade years. (*Id.*) J.W.'s classroom teachers implemented at least twenty-one different interventions to facilitate his learning

during his fourth-grade year, though some of the recommended interventions were not consistently implemented. (*Id.*)

On May 5, 2017, the district provided J.W.'s parents with a re-evaluation report. (*Id.*) The report stated that J.W.'s cognitive abilities were well below expected levels for a student his age. (Doc. 26 ¶ 9; Doc. 30 ¶ 9.) The report classified J.W. as having autism and speech and language impairments. (Hearing Officer Decision at 15.) The report found that J.W.'s cognitive ability was in the "borderline" range, with an IQ score of 67, verbal comprehension, visual-spatial recognition, and working memory skills that fell within the borderline range, and an extremely low score for fluid reasoning. (*Id.*) J.W.'s verbal expression and verbal reasoning skills were considered strengths, though they were still considered underdeveloped. (*Id.*) His ability to quickly scan and process information was considered a weakness. (*Id.*) The report also noted that J.W.'s ability to analyze and synthesize visual information was under-developed and that he had difficulty engaging in higher-level thinking and reasoning. (*Id.*)

The re-evaluation report noted that J.W. scored between low and extremely low on a standardized behavior inventory that measured his adaptive skills. (*Id.*) J.W. showed weaknesses across all adaptive domains, including functional academics, communication, social interaction, and practical skills. (*Id.*) J.W.'s academic achievement was rated as low, with his total academic achievement

24

falling in the first percentile for children his age and his reading comprehension, fluency, oral language, mathematics, and written expression scoring in the low range.  (*Id.*)  J.W. scored somewhat higher in the areas of total reading and basic reading, with his total reading rating as below average and his basic reading rating as average.  (*Id.* at 16–17.)

Although J.W. showed delays across all domains, the re-evaluation report found that he demonstrated relative strength in foundational academic information, including memorized categories of information, decoding, memorized vocabulary, memorized mathematics facts, spelling, and correct ending punctuation.  (*Id.* at 17.)  Nevertheless, the report found that J.W. struggled in applying that foundational information.  (*Id.*)

The re-evaluation report included a second assessment that was meant to measure J.W.'s reading comprehension using a "cloze" procedure that allowed him to fill in blanks in sentences with the correct word.  (*Id.*)  J.W.'s score under this procedure was consistent with his broader reading comprehension results, scoring in the very low range.  (*Id.*)

The re-evaluation report also included a standardized behavior inventory meant to measure J.W.'s attention and executive functions.  (*Id.*)  The assessment confirmed that J.W. had elevated levels of inattention, activity and movement, learning problems, impulsivity, difficulties with planning and organizing materials

and work, planning and managing his time, and relating to his peers.  (*Id.*)  A

standardized behavior inventory similarly corroborated J.W.'s autism diagnosis,

showing substantial difficulties with reciprocal social behavior that significantly

impacted his performance in school.  (*Id.*)  J.W.'s low score on a standardized

assessment of his visual-motor integration skills similarly corroborated the

cognitive test scores that had showed under-developed visual-motor integration

abilities.  (*Id.*)

Given J.W.'s results on the re-evaluation, the educator who conducted the

re-evaluation opined that J.W. consistently showed a need for more help than what

the district was providing him.  (Doc. 26 ¶ 15; Doc. 30 ¶ 15.)  The educator noted

that the gap between J.W.'s academic achievement and those of his peers would

likely continue to widen as J.W. got older.  (*Id.*)

Following the submission of the re-evaluation report to J.W.'s parents, the

district convened an IEP meeting on May 10, 2017.  (Hearing Officer Decision at

17.)  By this time, J.W. was demonstrating lower academic growth and lower

achievement in reading and writing, and his results for reading were both below

grade level and below basic.  (Doc. 26 ¶¶ 53–54; Doc. 30 ¶¶ 53–54.)  He had made

minimal progress towards his goal of reading at a second-grade level.  (*Id.*)

During the May 10, 2017 IEP meeting, both the district's educators and

J.W.'s parents agreed that J.W. needed additional support.  (Hearing Officer

Decision at 17.)  The district accordingly proposed an IEP that would increase

J.W.'s time in the special education classroom by thirty minutes and continue his

placement in supplemental learning support with thirty minutes per day of

instruction in the special education classroom for reading, writing, and

mathematics.  (*Id.*)

The May 10, 2017 IEP proposed to provide J.W. with 200 minutes per

month of pull-out speech and language instruction to address articulation and

receptive, expressive, and pragmatic language.  (*Id.*)  The IEP also proposed an

additional thirty-minute occupational therapy session per month, which was to be

provided during J.W.'s speech and language therapy session.  (*Id.*)

In terms of J.W.'s goals, the May 10, 2017 IEP proposed four speech and

language goals, a goal for J.W. to self-recognize his arousal states and use sensory

techniques to regain his attention to a task, a goal for J.W. to improve his writing

of topic sentences, a goal for J.W. to improve his reading comprehension using

"Maze" passages and multiple-choice questions, and two goals for J.W. to achieve

second-grade level mathematics.  (*Id.*)  The IEP also proposed modifications to

help with J.W.'s sensory processing, including sensory activities, "brain breaks," a

special cushion for J.W.'s chair, permission for J.W. to work in positions other

than sitting at his desk, and provision of various sensory devices for J.W.  (*Id.*)

The IEP further proposed that the district provide J.W. with an iPad and provide monthly training to him on how to use it.  (*Id.*)

In proposing the terms of J.W.'s fifth-grade IEP, the IEP team considered the thirty-five modifications and accommodations that had previously been provided to J.W. for classroom learning; the greater distraction that J.W. experienced in a regular education classroom as well as the greater distraction he caused for other students in such a setting; the social benefits J.W. would get from being in a regular education classroom; and the academic difficulties J.W. was experiencing as a result of his placement in a regular education classroom.  (*Id.* at 18–19.)  The IEP team also considered the assistive technology that J.W. had used on a trial basis during fourth grade.  (*Id.* at 19.)  The IEP team did not finalize J.W.'s fifth-grade IEP during the May 10, 2017 IEP meeting.  (*Id.*)  Instead, J.W.'s parents requested that the district provide them with certain documents and complete a Supplemental Aids and Services ("SAS") toolkit.[6]  (*Id.*)  Following the IEP meeting, the district obtained a consultation report authored by the district's literacy coach and a report from the IU's autism consultation team.  (*Id.* at 19–20.) The IU's report concluded that J.W. was prompt dependent.  (*Id.* at 20.)  The

---

[6] According to the hearing officer's decision, an SAS toolkit is "a state-facilitated process for identifying and developing interventions to overcome [and] barriers to inclusive instruction." (*Id.*)

district's literacy coach recommended chunking J.W.'s reading materials and teaching him comprehension skills by building from the word level to the sentence level and beyond.  (Doc. 27-1 ¶ 59; Doc. 31 ¶ 59.)

Beginning in September 2017, the district provided J.W. with forty-five minutes per day of structured, multisensory instruction in a small-group setting for reading, mathematics, writing, speech and language, and life skills.  (Hearing Officer Decision at 20.)  J.W.'s fifth-grade classroom also had a paraprofessional who worked with J.W. on foundational skills and writing paragraphs.  (*Id.*)  From September 2017 to December 2017, J.W. used both a laptop computer in the regular education classroom and an iPad in the special education classroom.  (*Id.*)  He made significant progress in writing topic sentences during this period.  (*Id.*)

During J.W.'s fifth-grade year, the district provided J.W. small-group instruction in the special education classroom that was tailored to the pace of the small group, including pre-reading of stories by the teacher followed by student reading, chunking of content and assessing comprehension step by step, and techniques to teach the students to draw inferences from text.  (*Id.*)  The instruction also included individualized guided practice and group responses.  (*Id.*)

J.W. made progress in reading comprehension during the first part of his fifth-grade year, but remained at a second-grade level for that skill.  (*Id.*)  He also made progress in mathematics, but remained below grade level.  (*Id.* at 21.)  J.W.

continued to receive speech and language therapy during this period.  (*Id.*)  He made significant progress in articulation and social language, but only minimal progress in receptive language and expressive language.  (*Id.*)  J.W.'s grades during the first period of fifth grade remained below benchmark across all subjects, including reading, writing, mathematics, social studies, and science.  (*Id.*)

Tests were modified for J.W. during his fifth-grade year.  (Doc. 26 ¶ 85; Doc. 30 ¶ 85.)  J.W.'s English teacher summarized material for him, gave him extra time to complete work, used graphic organizers, and taught J.W. materials sequentially.  (Doc. 26 ¶ 87; Doc. 30 ¶ 87.)  She also modified material for him and gave him directions both written and verbally.  (*Id.*)  Nevertheless, he struggled with English class, which his teacher attributed to insufficient support in a regular education classroom.  (*Id.*)

J.W.'s regular education classroom teacher also reported that he struggled in her class during fifth grade.  The classroom teacher used between thirty and forty adaptations to help facilitate J.W.'s learning, including preferential seating, eye contact, proximity, touching his desk to redirect his attention, extended time on quizzes and tests, assignments at home, adapted tests, adapted homework, and adapted assignments.  (Doc. 26 ¶ 98; Doc. 30 ¶ 98.)  The teacher often gave him a copy of her notes and partially or fully completed graphic organizers for him.  (*Id.*)  The teacher summarized materials for J.W. every day and allowed him as much

time as he needed to complete his work.  (Doc. 26 ¶ 101; Doc. 30 ¶ 101.)  The

teacher and the learning support teacher also worked together to modify the

curriculum for J.W.  (Doc. 26 ¶ 103; Doc. 30 ¶ 103.)  Despite all these

modifications in the classroom, however, J.W. continued to struggle and could not

keep up with the pace of work.  (Doc. 26 ¶ 104; Doc. 30 ¶ 104.)

On December 12, 2018, J.W.'s parents obtained a private psychoeducational

evaluation for him, which indicated that he had significant weaknesses in

processing speed, comprehension, and higher-level skills.  (Hearing Officer

Decision at 21.)  The evaluation recommended that J.W. be placed in a life skills

program to learn functional academics.  (*Id.*)

The district proposed a revised IEP for J.W. on December 22, 2017.  (*Id.*)

The revised IEP proposed to place J.W. in the learning support classroom for all

academic instruction except for thirty minutes per day of shared reading in the

regular education classroom, thirty minutes per day of academic content in the

regular education classroom, and all special subjects in the regular education

classroom.  (*Id.*)  Lunch, recess, and school-wide activities would also occur in the

regular education setting.  (*Id.*)  The revised IEP additionally proposed two twenty-

five-minute speech and language sessions per week and three sessions per month

of direct occupational therapy.  (*Id.*)

The December 22, 2017 revised IEP proposed to continue providing J.W. with structured, sequential instruction in a small-group setting for reading, mathematics, writing, speech and language, and life skills.  (*Id.* at 22.)  The revised IEP updated J.W.'s specific speech and language goals and proposed to provide a peer socialization coach for J.W.  (*Id.*)  Finally, the revised IEP proposed that J.W. would receive extended school year instruction at the IU four days per week, three hours per day, over a one-month period.  (*Id.*)

J.W.'s parents rejected the proposed IEP on December 29, 2017, and requested due process from the district on January 1, 2018.  (*Id.*)  Dr. Harty then observed J.W. twice during January 2018, once for a full day of classes, and the second time for one class.  (*Id.*)  Dr. Harty assessed J.W.'s reading and writing in February 2018 and produced a report on February 10, 2018.  (*Id.*)

Dr. Harty's report used a "qualitative formative assessment" of J.W.'s reading and writing ability that was based on research through the First Steps Project in the Western District of Australia.  (*Id.*)  Using this assessment device, the report concluded that J.W. exhibited reading skills in the independent reader and advanced reader phases, and that his reading was at least at a sixth-grade level. (*Id.*)  The report concluded that J.W.'s literal comprehension was at least at a fourth-grade level, noting that he showed the ability to conduct practical research on the internet.  (*Id.* at 22–23.)  The report recommended that J.W. be included in

the regular education classroom to the "maximum extent possible," noting that students educated in the regular education classroom generally demonstrate greater improvement in literacy as compared to those students who are not educated in such a setting.  (*Id.*)

Dr. Harty's report included a silent reading assessment, from which the report concluded that J.W.'s reading was appropriate for text at a fourth-grade level and above.  (*Id.*)  The report also included a spoken reading assessment and an assessment of J.W.'s writing.  (*Id.*)  The report concluded that J.W.'s writing demonstrated logical sequence and appropriate phrasing and that his writing improved when dictated through computer software.  (*Id.*)

Dr. Harty recommended that J.W. be provided speech and language therapy in the regular education classroom, recommended that J.W. be taught using "whole to part" instruction rather than "part to whole" instruction, and recommended that J.W. be taught using the reciprocal teaching and KOWL instructional methods. (*Id.*)  The report questioned the district's assessment instruments, noting that they measured parts first, did not allow J.W. to discuss, and were in some cases timed. (*Id.*)  Instead of the district's assessment methods, the report recommended that J.W. be tested solely through "authentic" assessment methods.  (*Id.*)  The report repeated Dr. Harty's earlier recommendation that J.W. be taught comprehension strategies through techniques of prior knowledge activation, prediction, thinking

aloud, retelling, and summarizing of information.  (*Id.*)  The report additionally recommended that J.W. be allowed to process text at his own speed, visualize, preview, and think about text, and not be subject to timing pressures or requirements to read aloud.  (*Id.*)

In terms of writing, Dr. Harty's report recommended that J.W. be given flexible time for written work, a scribe or voice-to-text software, leeway to verbalize his plan for writing, and freedom from too many prompts prior to writing.  (*Id.* at 24.)  The report recommended that J.W. be taught at a higher grade level than the level at which the district was teaching him.  (*Id.*)  Finally, the report recommended that J.W. be encouraged to have conversations about his reading, that he be allowed to use a laptop for research, that he be allowed to use a personal electronic dictionary, that he be allowed to read from literature that holds his interest, that he be allowed to select books that he enjoys reading, and that the school district repeatedly assess his need for assistive technology.  (*Id.*)

Following their rejection of the district's proposed IEP, J.W.'s parents withdrew him from the district's public schools and enrolled him in Commonwealth Charter Academy's online program.  (Doc. 27-1 ¶ 64; Doc. 31 ¶ 64.)  J.W. continues to attend that program to the present day, and continues to reside in Waynesboro Area School District.  (*Id.*)

## PROCEDURAL HISTORY

Following the request from J.W.'s parents for a due process hearing, the district and J.W.'s parents participated in a series of hearings before a special education hearing officer in March 2018 and May 2018.  (Hearing Officer Decision at 1.)  Based on those hearings and the other evidence of record, the hearing officer issued a decision on June 19, 2018, in which he concluded that the district had provided J.W. with a FAPE and had not otherwise violated IDEA, the Americans with Disabilities Act ("ADA"), or the Rehabilitation Act ("RA").  (*Id.*)

J.W.'s parents filed suit on his behalf in this district on August 22, 2018. (Doc. 1.)  In their complaint, Plaintiffs assert that the school district's proposed IEP in December 2017 violated IDEA, the ADA, and the RA.  (*Id.* ¶¶ 103–05.) The district answered the complaint on September 25, 2018.  (Doc. 7.)

On February 6, 2019, the administrative record of this case was added to the docket.  (Doc. 18.)  United States District Judge Yvette Kane granted Plaintiffs' motion to supplement the administrative record on September 6, 2019, allowing Plaintiffs to supplement the record with Dr. Harty's December 2018 evaluation of J.W.'s literacy and with J.W.'s January 2019 progress report.  (Doc. 19 at 8.)

The parties filed cross motions for summary judgment on November 18, 2018.  (Docs. 25, 27.) The case was reassigned from Judge Kane to the undersigned the following day pursuant to a verbal order.  Briefing on the motions

for summary judgment has since concluded, and the motions are ripe for the court's review.  (*See* Docs. 28–29, 32–35.)

### THE SPECIAL EDUCATION HEARING OFFICER'S DECISION

In his June 19, 2018 decision, the special education hearing officer concluded that the district had provided J.W. with a FAPE and had not otherwise violated IDEA, the ADA, or the RA when it proposed to increase the time that J.W. was to spend in a special education classroom.  (Decision at 60.)

The hearing officer's decision first addressed the opinions of the parents' experts.  The decision afforded reduced weight to Dr. Harty's opinion.  (*Id.* at 25.) Although Dr. Harty was "eminently qualified" to offer opinions on J.W.'s reading ability and on whether he should be instructed in a regular education classroom, the decision found several problems with the methodology that she employed in evaluating J.W.  (*Id.* at 27.)  First, the decision noted that Dr. Harty "presume[d] that full inclusion is appropriate for every child regardless of unique individual need."  (*Id.*)  Second, the decision noted that Dr. Harty's conclusions about J.W.'s reading abilities were based on a single assessment conducted over a two-hour period.  (*Id.* at 28.)  The hearing officer found that this likely made the assessment less reliable, because, as the district's literacy specialist noted, Dr. Harty's assessment was based on a continuum model that is less accurate when used in a single session and more accurate when data points are collected over time.  (*Id.*

28–29.)  Third, the decision noted that Dr. Harty did not adequately explain why her assessment of J.W.'s reading ability differed so significantly from the vast amount of evidence suggesting that J.W.'s reading ability was below benchmarks for his age and grade level.  (*Id.* at 29–31.)

The decision also gave reduced weight to Lytton's assistive technology assessment.  (*Id.* at 31.)  The decision acknowledged that Lytton had expertise in the field of assistive technology, but found that his opinion should be afforded less weight because he did not interview J.W.'s educators or observe J.W. in the classroom.  (*Id.*)  This was in contrast to Cunningham-Henise, who observed J.W. in the classroom, interviewed his educators, and conducted multiple tests of assistive technology with J.W.  (*Id.*)

The decision similarly gave reduced weight to the parents' expert in sensory needs.  (*Id.* at 32.)  Although the decision acknowledged the expert's "formidable expertise in sensory needs and how to address them clinically," the decision noted that the expert based her assessment of J.W.'s sensory needs solely on her clinical observations of him without speaking with J.W.'s district occupational therapist or observing J.W. in the classroom setting.  (*Id.*)  The decision further noted that the parents' sensory needs expert seemed to harbor personal animosity towards district educators because of how she was treated during one of J.W.'s IEP meetings and

37

that this personal animosity seemed to color some of her criticisms of the district's methods.  (*Id.*)

Turning to the other witnesses who testified during J.W.'s due process hearing, the hearing officer found that all of them were credible and reliable.  (*Id.* at 33.)  The decision specifically noted that J.W.'s mother's testimony was credible.  (*Id.*)  The decision afforded greater weight to the testimony of the district's educators, however, based on the fact that those witnesses had more experience and expertise than J.W.'s mother did.  (*Id.*)

After addressing the weight given to witnesses in the due process hearings, the hearing officer concluded that the district provided a FAPE to J.W.  (*Id.* at 35.)  The hearing officer found that the district employed "individualized instructional techniques" at a level that was appropriate for J.W.'s instructional grade level.  (*Id.* at 36.)  The decision additionally found that the district had provided substantial interventions to help improve J.W.'s academic performance.  (*Id.*)

Although J.W.'s parents argued that the district failed to provide J.W. with needed assistive technology, the decision rejected this argument, finding that the district had adequately considered J.W.'s need for assistive technology, provided some assistive technology, and reasonably concluded that further assistive technology was not necessary.  (*Id.* at 38–40.)  The decision similarly concluded

that the district had adequately and appropriately addressed J.W.'s sensory needs. (*Id.* at 40–41.)

The hearing officer next addressed the parents' argument that the district had not provided appropriate services to help J.W. learn to interact with his peers. (*Id.* at 42.) The hearing officer found that the district had adequately addressed this concern, encouraging J.W. to play with his peers during recess and setting speech and language goals and other goals in his IEP that were meant to improve his ability to socialize with peers. (*Id.*)

The decision also rejected the parents' argument that the district should have assigned a paraprofessional to work with J.W. on a one-to-one basis throughout the school day. (*Id.* at 43.) The decision noted that J.W.'s fourth- and fifth-grade classrooms had been staffed with paraprofessionals who had helped J.W. along with other students, and found that increased paraprofessional support for J.W. was not supported by the record given that J.W. appeared to be more anxious and prompt dependent when such support was present in the classroom. (*Id.*)

Based on his factual findings regarding J.W.'s educational needs, the hearing officer found that the district's December 2017 proposed IEP was an appropriate offer of services to provide a FAPE to J.W. (*Id.* at 44.) The hearing officer further concluded that the proposed IEP had given full consideration to possible

39

alternatives and had satisfied IDEA's least restrictive environment requirement. (*Id.* at 48.)

Having concluded that the district did not violate IDEA, the decision similarly concluded that the district had not violated the ADA or the RA. (*Id.* at 59–60.) The decision noted that the district's compliance with IDEA provided preponderant evidence that it had also complied with the ADA and the RA. (*Id.*)

**DISCUSSION**

At the summary judgment stage, the district argues that it is entitled to summary judgment because it provided J.W. with a FAPE, placed him in the least restrictive environment, and did not otherwise violate IDEA, the ADA, or the RA. (Doc. 28.) Plaintiffs raise several arguments to the contrary as to why the district's proposed IEP violated IDEA, the ADA, and the RA. (Doc. 29.) Having reviewed the administrative record and the parties' summary judgment arguments, the court will uphold the education hearing officer's decision in favor of the district.

### A. The District Has Provided J.W. with a FAPE

To begin, the court finds that the district has provided J.W. with a FAPE. As noted above, a child's IEP satisfies the FAPE requirement if it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. "The IEP must aim to enable the

child to make progress" since "the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id.*

Here, the district proposed an IEP that significantly reduced the amount of time J.W. was to spend in a regular education classroom based on years of data showing that he was struggling to make progress in a regular education classroom. J.W.'s academic achievement during his fifth-grade year had continued to lag well below expected levels, despite numerous modifications made by his teachers to help facilitate his learning. (*See* Hearing Officer Decision at 21; Doc. 26 ¶¶ 85, 87, 98, 101, 103–04; Doc. 30 ¶¶ 85, 87, 98, 101, 103–04.) Educators in the district had also opined that J.W. needed more individualized assistance than what could be provided in the regular education classroom. (*See, e.g.*, Doc. 26 ¶¶ 15, 49; Doc. 30 ¶¶ 15, 49.) Evidence in the record additionally suggested that J.W. was less distracted in a small-group setting than he was in the regular education classroom. (*See* Hearing Officer Decision at 14.) Faced with such evidence, the court finds that the district's proposal to reduce J.W.'s time in a regular education classroom was "reasonably calculated" to enable J.W. to make progress in light of his individual circumstances, *Endrew F.*, 137 S. Ct. at 999, and accordingly provided him with a FAPE.

**B. The District Placed J.W. in the Least Restrictive Environment**

The proposed IEP also satisfies IDEA's requirement that J.W. be placed in the least restrictive environment.  IDEA's least restrictive environment standard requires that students with disabilities be educated with students who are not disabled "to the maximum extent appropriate."  20 U.S.C. § 1412(a)(5)(A).  This standard prohibits a school district from "placing a child with disabilities outside of a regular classroom if educating the child in the regular classroom, with supplementary aids and support services, can be achieved satisfactorily."  *Oberti*, 995 F.2d at 1207.

Third Circuit precedent requires this court to apply a two-part test to determine whether a child has been placed in the least restrictive environment under IDEA.  *Id.* at 1215.  "First, the court must determine 'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'"  *Id.* (quoting *Daniel R.R. v. State Bd. of Educ.*, 847 F.2d 1036, 1048 (5th Cir. 1989)).  "Second, if the court finds that placement outside of a regular classroom is necessary for the child to benefit educationally, then the court must decide 'whether the school has mainstreamed the child to the maximum extent appropriate,' i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible."  *Id.* (quoting *Daniel R.R.*, 847 F.2d at 1048).  In considering whether a child with a disability

42

can be satisfactorily educated in the regular education classroom, a court should consider: "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (quoting *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000)).

For a school district's accommodation efforts to satisfy IDEA, the district generally must consider supplemental aids and services and modifications to the regular education program to accommodate the child. *Oberti*, 995 F.2d at 1215. A school has most likely violated IDEA's least restrictive environment requirement if it "has given no serious consideration to including the child in a regular class with . . . supplementary aids and services and to modifying the regular curriculum to accommodate the child." *Id.* The school's consideration in this regard cannot be "mere token gestures" to accommodate children with disabilities. *Id.*

When considering a child's ability to receive an education benefit in the regular education classroom, the court should compare "the educational benefits the child will receive in a regular classroom (with supplementary aids and services) and the benefits the child will receive in the segregated, special education classroom." *Id.* This analysis should not be confined to the student's academic progress: "the court must pay special attention to those unique benefits the child

may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers." *Id.* (citing *Daniel R.R.*, 847 F.2d at 1049). Thus, even if the student might make greater academic progress outside of the regular education classroom, this does not automatically justify removing him from the regular education classroom. *Id.* at 1217.

Here, the court will uphold the hearing officer's determination that the district has satisfied IDEA's least restrictive environment test. The court agrees with the hearing officer's conclusion that J.W. could not be educated satisfactorily in a regular education classroom. As noted above, the district determined that J.W. should spend less time in a regular education classroom only after years of data showed that he struggled to make progress in such an environment and that his academic achievement continued to lag further and further behind that of his peers. (*See* Hearing Officer Decision at 21; Doc. 26 ¶¶ 85, 87, 98, 101, 103–04; Doc. 30 ¶¶ 85, 87, 98, 101, 103–04.)

It is also clear that the district has given serious consideration to supplemental aids and services to accommodate J.W.'s learning and has modified the regular education program to suit his needs. The district implemented numerous supplemental aids and services throughout the six years leading up to J.W.'s revised IEP. (*See, e.g.*, Hearing Officer Decision at 6–7, 9–11, 15, 17, 20;

Doc. 26 ¶¶ 34, 44, 87, 98, 101; Doc. 30 ¶¶ 34, 44, 87, 98, 101; Doc. 27-1 ¶¶ 80–82;

Doc. 31 ¶¶ 81–82.)  The district also modified the regular education curriculum

and other aspects of the program so as to accommodate J.W.  (*See, e.g.*, Doc. 26 ¶¶

34, 36, 40, 46, 85, 98; Doc. 30 ¶¶ 34, 36, 40, 46, 85, 98.)  Additionally, evidence in

the record suggests that J.W.'s presence in the regular education classroom led to

greater distraction for both him and the other students.  (*See, e.g.*, Hearing Officer

Decision at 8, 14, 18–19.)  In light of this evidence, the court agrees with the

hearing officer's conclusion that J.W. could not be satisfactorily educated in the

regular education classroom.

Having reached that conclusion, the court must turn its attention to the

second part of the two-part test under *Oberti*: "'whether the school has

mainstreamed the child to the maximum extent appropriate,' i.e., whether the

school has made efforts to include the child in school programs with nondisabled

children whenever possible."  *Oberti*, 995 F.2d at 1215 (quoting *Daniel R.R.*, 847

F.2d at 1048).  The court finds that the district has met that standard.  The district's

proposed IEP provided for thirty minutes per day of shared reading in the regular

education classroom; thirty minutes per day of academic content in the regular

education classroom; all special subjects in the regular education classroom; and

lunch, recess, and school-wide activities in the regular education setting.  (*See*

Hearing Officer Decision at 21.)  This proposed schedule for time in the regular

education classroom is notably similar to dicta in *Oberti* suggesting what opportunities a student should have in the regular education setting.  *See Oberti*, 995 F.2d at 1215 ("[T]he school is still required to include that child in school programs with nondisabled children (specific academic classes, other classes such as music and art, lunch, recess, etc.) whenever possible.").  Accordingly, because J.W. could not be educated satisfactorily in the regular education classroom and because the district has made efforts to include him in the regular education setting whenever possible, the court finds that the district has satisfied IDEA's least restrictive environment requirement.

### C. The District Did Not Violate the ADA or the RA

The court will next analyze Plaintiffs' claims under the ADA and the RA. The substantive standard under the ADA and the RA is the same: Plaintiffs must show that J.W. "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability."  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013) (quoting *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)). A school district may violate the ADA and the RA when it unjustifiably isolates students with disabilities from other students.  *See Olmstead v. L.C. ex rel.*

*Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination based on disability.").

Plaintiffs in this case argue that the district violated the ADA and the RA because it "failed to provide numerous reasonable accommodations and supplementary aids and services" and then proposed an IEP that would unjustifiably isolate J.W. from other students.  (Doc. 29 at 30–31.)

Although Plaintiffs frame their ADA and RA arguments as a denial of education in the "most integrated setting" possible, *see* Doc. 33 at 29–30, the facts underlying the ADA and RA claims are identical to the facts underlying Plaintiffs' least restrictive environment claim under IDEA.  Indeed, in their brief in support of their motion for summary judgment, Plaintiffs cross-reference the factual discussion in their least restrictive environment argument, noting that the district's actions that purportedly violate the ADA and the RA are "discussed more fully" in that section.  (Doc. 29 at 31.)  Thus, given that the ADA and RA claims are based on facts that are identical to the facts underlying Plaintiffs' least restrictive environment argument, the court will grant the district summary judgment as to Plaintiffs' ADA and RA claims for the same reason it grants summary judgment on the least restrictive environment argument.  *See, e.g.*, *Melissa S. v. Sch. Dist. of Pittsburgh*, 183 F. App'x 184, 189 (3d Cir. 2006) ("Because the allegations underlying the Rehabilitation Act claim do not differ substantively from those

47

underlying the IDEA claim, we will also affirm the District Court's grant of summary judgment on this claim."); *C.G. v. Pa. Dep't of Educ.*, 888 F. Supp. 2d 534, 573–74 (M.D. Pa. 2012) (granting judgment to school district where Plaintiffs' ADA and RA claims were "based on the same allegations and theories that underlie their IDEA claims").

### D. The District Did Not Deny J.W.'s Parents the Right to Participate in J.W.'s IEP Process

In addition to the IDEA, ADA, and RA claims, Plaintiffs assert in their complaint that the district denied J.W.'s parents the right to participate in his IEP process.  (*See* Doc. 1 ¶ 91.)  Plaintiffs do not make any arguments about this claim in their motion for summary judgment, but argue in opposition to the district's motion that they did not fully understand the proposed IEP, that the district did not fully explain the proposed IEP, and that the district failed to address the parents' concerns during the IEP meeting.  (Doc. 33 at 26–27.)  Plaintiffs do not cite any evidence in support of these conclusory arguments, and the administrative record shows that parents participated in J.W.'s IEP process extensively.  Accordingly, the court will grant the district summary judgment as to this claim.

### E. Plaintiffs' Arguments Do Not Provide a Basis to Overturn the Special Education Hearing Officer's Decision

Plaintiffs' arguments at the summary judgment stage do not alter this court's conclusion that the special education hearing officer's decision should be upheld.

48

Plaintiffs first argue that the hearing officer erred by giving reduced weight to Dr. Harty's opinion.  (Doc. 29 at 12–16.)  According to Plaintiffs, the hearing officer rejected Dr. Harty's opinion because of Dr. Harty's "perceived presumption in favor of maximum inclusion."  (*Id.* at 13–14.)  Plaintiffs argue that this was not a valid reason to discount Dr. Harty's opinion because the text of IDEA explicitly favors inclusion and because Dr. Harty's preference for inclusion "accords with the law and research-based practices."  (*Id.* at 14.)  Plaintiffs note that "[n]umerous federal courts have rejected the argument [that] one should presume that students with severe disabilities cannot be educated in the general education setting."  (*Id.*)

Plaintiffs' argument does not persuade the court that it should reject the hearing officer's credibility determination regarding Dr. Harty's opinion.  Notably, the court must accept the hearing officer's credibility determination "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion."  *Shore Regional*, 381 F.3d at 199 (quoting *Carlisle*, 62 F.3d at 529).  That is not the case here.  Contrary to Plaintiffs' argument, the hearing officer did not discount Dr. Harty's opinion because of a "perceived presumption in favor of maximum inclusion," but rather because Dr. Harty appeared to "presume that full inclusion is appropriate for every child regardless of unique individual need."  (Hearing Officer Decision at 27.)  Thus, Dr. Harty's opinion was afforded less weight because it had insufficiently considered J.W.'s individual needs when it had

49

stated a preference for inclusion, and not merely because it favored inclusion. Moreover, Plaintiffs' argument ignores the hearing officer's other stated reasons for discounting Dr. Harty's opinion, namely that the opinion was only based on a single assessment of J.W. and that the opinion had not adequately explained why it differed so significantly from the data showing that J.W.'s reading was below what was expected of a child his age.  (*See* Hearing Officer Decision at 28–31.)

Plaintiffs next make a series of arguments regarding the district's accommodation of J.W., none of which justify overturning the hearing officer's decision.  First, Plaintiffs note that the hearing officer found "concerning evidence" that district staff members were not sufficiently trained in inclusive practices, but that the hearing officer "wrongly ignored" this factual finding.  (Doc. 29 at 17.) Plaintiffs do not, however, explain how the hearing officer's purported error affected his decision or prejudiced J.W.  Accordingly, because Plaintiffs bear the burden of persuasion, *Schaffer*, 546 U.S. at 62, their argument is without merit.

Second, Plaintiffs assert that despite the hearing officer's determination that the district had made thirty-five modifications or accommodations to J.W.'s program during fourth and fifth grade, "no District witness was able to remember a discussion of these services."  (Doc. 29 at 18.)  This argument is also without merit because Plaintiffs fail to specify what error the education hearing officer made or how the error prejudiced J.W.

Third, Plaintiffs argue that the district violated IDEA by not implementing the "whole to part" instruction method advocated by Dr. Harty.  (*Id.* at 18–19.) Plaintiffs assert that the hearing officer upheld the district's decision because the district had the discretion to choose its own methodology, but Plaintiffs argue that "[t]his was legal error because IDEA imposes no such blind deference to educational choices." (*Id.* at 19.)  Plaintiffs note that the district introduced no evidence as to why the part to whole method that the district employed was better suited to J.W.'s need than the whole to part method advocated by Dr. Harty.  (*Id.* at 19–20.)

Plaintiffs' argument is without merit.  Under IDEA, school districts are not required to implement any particular educational method.  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 278–79 (3d Cir. 2012).  Instead, "IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide [the student] with educational benefit." *Id.* (quoting *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011)).  Here, the hearing officer concluded that the district's method was reasonably calculated to provide J.W. with educational benefit because the district's educators "testified credibly that it is often preferable to teach [J.W.] smaller parts of a skill." (Hearing Officer Decision at 37.) Although Plaintiffs assert that the district did not introduce any evidence to support

such a conclusion, they do not cite evidence in the record to establish that the district's method was not reasonably calculated to provide J.W. with educational benefit.  Because factual findings from the hearing officer's decision "are to be considered prima facie correct," *P.P.*, 585 F.3d at 734, and Plaintiffs bear the burden of persuading this court to depart from those findings, *Schaffer*, 546 U.S. at 62, Plaintiffs' failure to cite any such evidence is fatal to their argument.

Plaintiffs next argue that the district violated IDEA because it "never explored appropriate assistive technology" as an accommodation for J.W. and because it rejected the assistive technology suggested by Lytton.  (Doc. 29 at 20–24.)  The court rejects this argument.  First, as noted above, the hearing officer justifiably assigned reduced weight to Lytton's opinion, and the court has found no error in that assignment of weight.  Second, Plaintiffs' argument that the district "never explored appropriate assistive technology" misrepresents the factual record.  Contrary to Plaintiffs' contention, evidence of record shows that the district both considered and implemented numerous assistive technology measures, including, among other things, tangible spacers to support J.W.'s writing, an iPad, graphic visual supports to help J.W. with math and writing, adapted cutting paper to provide J.W. with visual support, and a laptop. (*See* Hearing Officer Decision at 6, 10, 20.)  Although Plaintiffs might disagree about the amount of assistive

technology that the district should have used to aid J.W., such a disagreement does not constitute a violation of IDEA.

Plaintiffs also argue that the district violated IDEA by not implementing sufficient steps to accommodate J.W.'s sensory needs.  (Doc. 29 at 24–25.)  The court rejects this argument.  Evidence of record shows that the district gave serious consideration to J.W.'s sensory needs throughout his time as a student in the district and that the district implemented occupational therapy and other interventions to accommodate his sensory needs.  (*See, e.g.*, Hearing Officer Decision at 9, 13, 17, 21.)  In light of that evidence, the court finds that the district's accommodations of J.W.'s sensory needs were "reasonably calculated" to enable him to make progress appropriate to his circumstances.  *Endrew F.*, 137 S. Ct. at 999.

Finally, Plaintiffs argue that the district violated IDEA by not completing an SAS toolkit prior to reducing J.W.'s time in the regular education classroom. (Doc. 29 at 25–26.)  The hearing officer found that the district did not complete parts of the SAS toolkit, but found that there was sufficient evidence that the district considered supplemental aids and services such that any failure to complete the SAS toolkit did not violate IDEA.  (Hearing Officer Decision at 51 n.13.)

The court will uphold the hearing officer's determination.  As noted above, the district has implemented numerous supplemental aids and services throughout

the six years leading up to J.W.'s revised IEP.  (*See, e.g.*, Hearing Officer Decision at 6–7, 9–11, 15, 17, 20; Doc. 26 ¶¶ 34, 44, 87, 98, 101; Doc. 30 ¶¶ 34, 44, 87, 98, 101; Doc. 27-1 ¶¶ 80–82; Doc. 31 ¶¶ 81–82.)  In light of that evidence, the district's failure to complete portions of the SAS toolkit does not violate IDEA.

## CONCLUSION

For the foregoing reasons, the district's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: August 21, 2020